FILED

01/31/2025

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs January 14, 2025

## STATE OF TENNESSEE v. ROGER BRIDGES

**Appeal from the Criminal Court for Shelby County**

No. 19-00723        W. Mark Ward, Judge

_____

### No. W2024-00528-CCA-R3-CD

_____

The Defendant, Roger Bridges,[1] was convicted by a Shelby County Criminal Court jury of three counts of aggravated sexual battery, a Class B felony; sexual battery, a Class E felony; rape, a Class B felony; and rape of a child, a Class A felony, and was sentenced by the trial court to an effective term of fifty-one years at 100% in the Tennessee Department of Correction. The four victims involved were three sisters and their female first cousin, and the offenses occurred over a two-month period that culminated on June 12, 2018, when one of the three sisters divulged the abuse to her father, who called the police. On appeal, the Defendant challenges the sufficiency of the convicting evidence and argues that the State violated *Brady v. Maryland*, 373 U.S 83 (1973), "by failing to produce information concerning the pending investigation of a male family member for sexual abuse crimes against some of the same family group."[2] Based on our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN W. CAMPBELL, SR., J, delivered the opinion of the court, in which J. ROSS DYER and MATTHEW J. WILSON, JJ., joined.

---

[1] The Defendant's first name is spelled as "Rodger" at several places in the record. Consistent with the policy of this court, we use the spelling contained in the indictment.

[2] The Defendant lists as a third issue in his brief "Whether the trial court erred[.]" He does not specify how the trial court allegedly erred, provides no argument on the issue, and does not refer to it again in the body of the brief. Accordingly, this issue is waived. *See* Tenn. R. Ct. Crim. App. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.").

Harry E. Sayle, III, Shelby County Assistant Public Defender (on appeal), and Lee Filderman and Erim Sarinoglu, Shelby County Assistant Public Defenders (at trial), for the appellant, Roger Bridges.

Jonathan Skrmetti, Attorney General and Reporter; J. Katie Neff, Assistant Attorney General; Steven R. Mulroy, District Attorney General; and Gavin Smith and Devon Dennis, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

In 2018, the Defendant and the Defendant's wife, Monica Bridges, temporarily lived in the small Memphis home of Reginald B., who was the father of victims B.B., G.B. and F.S., and the uncle of victim M.B.[3]  Mr. B. and his wife slept in one of the home's two bedrooms, their seven children who lived with them, including B.B., G.B., and F.S., slept in the second bedroom, and the Defendant and Mrs. Bridges slept on a pull-out couch in the living room.  Approximately two months into the shared living arrangement, twelve-year-old G.B. tearfully disclosed to her father that the Defendant had been touching her inappropriately.  An investigation ensued that led to the Shelby County Grand Jury's return of a seven-count indictment against the Defendant.  The Defendant was charged in count one with the aggravated sexual battery of B.B., in count two with the aggravated sexual battery of M.B., in count three with the sexual battery of F.S., in count four with the rape of F.S., in count five with the aggravated sexual battery of G.B., in count six with the rape of a child (G.B.), and in count seven with the rape of a child, with the named victim a sister of B.B., G.B, and F.S.  The State later nolle prosequied count seven, leaving the Defendant to proceed to a jury trial in May 2022 on counts one through six of the indictment.

### State's Proof

Mr. B. testified that he lived in a two-bedroom, one bath home on Pope Street in Memphis with his wife and seven of his ten children - - five daughters and two sons.  He and his wife met the Defendant and Mrs. Bridges at a restaurant in 2018, and he and the Defendant struck up a close friendship.  One to two months later, he invited the Defendant and Mrs. Bridges, who had recently lost their home, to move into his Pope Street residence with his family.  Prior to the couple's arrival, Mr. B. and his wife slept in one bedroom, six

---

[3]  To preserve the privacy of the minor victims, we refer to the father of the three sister victims by his first name and last initial and refer to the victims by their initials only.

of the children slept in the second bedroom, and G.B. slept on a pull-out couch in the living room. After the Defendant and Mrs. Bridges moved in, G.B. moved into the children's bedroom with her six siblings. Mr. B. estimated that the Defendant and Mrs. Bridges lived in his home for approximately two months.

On the night that the shared living arrangement came to an end, June 12, 2018, Mr. B. and his wife had gone to dinner with the Defendant and Mrs. Bridges. When they returned home, G.B. was on the front porch crying. After talking to G.B., Mr. B. called the police and later took several of his children to the Memphis Child Advocacy Center to be interviewed. Mr. B. testified that he had no ill will toward the Defendant prior to June 12 and no reason to fabricate allegations against him.

On cross-examination, Mr. B. acknowledged that he did not have a job in 2018 and spent a lot of time at home working on cars. He stated that his wife spent most of her time at either his sister's home or his brother's home. He said his brother lived in South Memphis during that time. He testified that the night that he returned home to find G.B. crying on the front porch was the first he learned that the Defendant was touching G.B. The news was shocking; prior to that night, he had no suspicion that any such thing was occurring.

Mr. B. acknowledged that there had been an incident in which a man in a vehicle had exposed himself to G.B., which resulted in G.B.'s giving a statement at the Memphis Child Advocacy Center. He could not recall when that incident occurred or whether it was just before G.B.'s June 12 revelation about the Defendant's behavior. He further acknowledged that his children and M.B., the daughter of his brother Carl, used to visit back and forth at each other's homes but that that no longer happened. He agreed that G.B. was able to sleep by herself in the living room before the Defendant and Mrs. Bridges came, and that the children's use of the living room as a playroom was restricted by the Defendant and Mrs. Bridges's presence in the home. Finally, he acknowledged that G.B. was the most responsible of his children, the one he left in charge of the others when he and his wife were not home, and the one the other children looked up to and desired to emulate.

Sixteen-year-old G.B., who said that her birthday was March 22, 2006, testified that when she was twelve or thirteen, her father allowed the Defendant and Mrs. Bridges to live with her family in their Pope Street home "for a while until they got back on the[ir] feet." During that time, the Defendant touched her and her siblings. She said that the Defendant touched her on her breasts and on her private part, which she identified on an anatomical drawing of a girl as her pubic area. The Defendant touched her on her breasts and her private part on more than one occasion, and the touching occurred in the living room and

in the children's bedroom. She and the Defendant were alone when the touching occurred, and the Defendant never said anything as he was touching her.

G.B. testified that the Defendant also asked her to touch him and circled on an anatomical drawing of a boy the pubic area as the part of his body he asked her to touch. She said that the Defendant asked her "[t]o put [her] mouth on it[,]" and that she complied. That touching occurred in the living room and in the children's bedroom as well. When asked if anything happened to the Defendant's body when she was finished touching him with her mouth, she stated that the Defendant would "cum," which she described as having something "[s]pray out" of his "private area."

G.B. testified that the Defendant also made her touch him near the shed in the yard of her home. She identified the CD of her videotaped interview at the Memphis Child Advocacy Center and said that she told the truth during that interview.

On cross-examination, G.B. acknowledged that before the Defendant and Mrs. Bridges came to live with her family, she had the entire living room to sleep in by herself, which she enjoyed. She agreed that she said in her forensic interview that she told her father about the touching prior to June 12, 2018, and that her father told the Defendant to stop it and warned her to stay away from the Defendant. She acknowledged that she told the forensic interviewer that she had also divulged the abuse prior to June 12 to her Aunt Loretta, her Uncle Anthony, her grandmother, and her sister, F.S. She stated that she told the nurse who conducted her physical examination on June 13, 2018, everything that had happened to her and agreed that she did not say that the Defendant's penis was put inside her body. She acknowledged that she had a large extended family with numerous aunts and uncles and cousins with whom she regularly visited.

On redirect examination, G.B. repeated her earlier testimony that the Defendant placed his private part inside her mouth and said that she was telling the truth during her trial testimony.

Nineteen-year-old F.S., who was developmentally disabled, said that she was born on March 12, 2003. She testified that during the time that the Defendant and Mrs. Bridges lived with her family, the Defendant touched her chest, or "[b]oobs[,]" and her "[m]iddle part." On an anatomical drawing of a girl, she circled the breasts and pubic area to indicate the areas that the Defendant touched. She said it happened one time and that her clothes were on. Upon further questioning, she testified that there was a time when the Defendant's fingers went inside her middle part. She said that she and the Defendant were alone in the front room, that the temperature was hot, and that it was in the daytime on a weekend after spring break. She stated that she had also seen the Defendant touch G.B. in G.B.'s middle part while the Defendant and G.B. were in the front room, on a different day from the day

that the Defendant touched her. She testified that she did not tell anyone what happened because she was "[s]cared." She identified the CD of her forensic interview at the Memphis Child Advocacy Center and said that she told the truth during that interview. She testified that B.B. never talked to her about what had happened to B.B., but that G.B. talked to her about what had happened to G.B. She said that she was telling the truth during her trial testimony and trying her best to remember everything that had happened.

On cross-examination, F.S. acknowledged that she loved G.B. and her entire family. She agreed that G.B. took care of everyone when there were no adults present, that G.B. was nice to her, and that she and her siblings all looked up to G.B. She acknowledged that during her forensic interview, she said that she did not know if the Defendant had touched anyone else, and that she had never before told anyone about what had happened to her. She said she told the truth during that interview. On redirect examination, F.S. repeated that she was doing her best during the forensic interview and at trial to remember all the details and that she was telling the truth.

Ten-year-old B.B., who said her birthday was November 13, 2011, testified that during the time that the Defendant lived with her family, there was an occasion when she came in from outside and saw the Defendant sitting on a couch with M.B. in the front room of the house. She stated that there was a cover over them, and that the Defendant was touching M.B. She testified that the Defendant never touched her. When asked if she recalled being interviewed at the Memphis Child Advocacy Center, she responded in the affirmative and identified the initials she had placed on the CD of her interview. She said that it was very hard for her to testify and, when asked what her one job was that day, replied that it was to tell the truth. She was then asked if the Defendant ever asked her to touch any part of his body. She replied in the affirmative, testifying that the Defendant asked her to touch "[h]is middle part[,]" which she identified on an anatomical drawing of a boy as the pubic area. She said that she and the Defendant were in the front room, and that no one else was present at the time.

B.B. recalled having told the prosecutors that the Defendant had touched her body as well, and she identified on an anatomical drawing of a girl the breasts, pubic area, and buttocks as the places on her body that the Defendant touched. She stated that the Defendant's clothes were off when she touched him, and that her clothes were on when the Defendant touched her. She agreed that her nervousness about testifying was the reason that she at first denied that the Defendant had touched her and said that she was telling the truth in her trial testimony.

On cross-examination, B.B. acknowledged that she and her siblings could no longer play in the living room after the Defendant and Mrs. Bridges moved in. She said she sometimes looked up to G.B., that she loved G.B., and that she wanted to support G.B. She

acknowledged that she had a lot of cousins, and that her cousin M.B. spent time at her home and that she spent time at M.B.'s home. On redirect examination, she testified that she liked and got along with the Defendant when he first came to live with them.

Eleven-year-old M.B., who said her birthday was October 13, 2010, testified that she and her cousins were close, and that she used to frequently go to their home to play with them, sometimes spending the night. She recalled one occasion after the Defendant and his wife had moved into her cousins' home when her father dropped her and her little brother off at the home. She stated that it was nighttime during her spring break, and that she was alone in the front room watching television while her cousins were in their bedroom. The Defendant was at first outside in the garage with her uncle and aunt, but the Defendant then came inside, sat beside her on the couch, and touched her underneath her clothes on her chest and on top of her vulva, which she referred to as her "middle part." The Defendant's clothes were on, and he did not say anything as he was touching her. The touching lasted a long time. She never saw the Defendant touch anyone else. That same day, she talked to her cousin, G.B., about what had happened to G.B. M.B. identified the CD of her forensic interview at the Memphis Child Advocacy Center and said that she had told the truth during that interview and was telling the truth at trial.

On cross-examination, M.B. acknowledged that her father was named Carl but denied that they lived down the street from Mr. B.'s home at the time of the incident, testifying that they lived "[i]n front of [her] grandma." She could not recall having at first said during her forensic interview that she saw G.B. being touched, or having later said that she never saw G.B. being touched. She testified that she never saw G.B. being touched, but that G.B. told her that she had been touched. She was present at the home on the day that the police were called, but it was not the same day that the Defendant touched her on the couch in the living room. She agreed that all her cousins were present when G.B. told her what had happened to G.B. She said she did not talk to her cousins the previous day about her trial testimony but had talked to them that morning. She agreed that she was nervous about testifying and that the prosecutors had prepared her trial testimony.

On redirect examination, she acknowledged that her conversations that morning with her cousins and the prosecutor were about her being frightened to testify, and that no one told her during those conversations what she should say. She agreed that the prosecutor had told her that her most important job was to tell the truth. She said she remembered once "peeking through a door" and seeing G.B. "standing there" with the Defendant. She stated that that was all she saw.

Memphis Police Department ("MPD") Officer Matthew Christopher testified that on June 12, 2018, he was working the Delta Shift from 5:00 p.m. to 1:00 a.m., when he responded to a call about an "inappropriate touching" at the residence on Pope Street.

When he arrived, he took a report from Mr. B., who stated that his daughter and some other family members had been inappropriately touched by a friend of his who had been staying at his home. Because of the serious nature of the allegations, Officer Christopher notified his supervisor, who in turn contacted the Felony Response Unit.

MPD Lieutenant Nathan Wilbern, who was a sergeant in the Sex Crimes Bureau in 2018, testified that he was called out to the scene that night, where he gathered information before arranging for all the victims, regardless of age, to be interviewed at the Memphis Child Advocacy Center. He said he arranged for all the victims to be interviewed there because it appeared to him that some were "mentally challenged so [they] want[ed] to set them up with a professional to speak to them." He stated that he attempted to speak to F.S. at the scene, but she was "wide-eyed[,]" kept rolling and shaking her head, and did not say anything.

On cross-examination, he testified that the victims identified the perpetrator as the Defendant during their forensic interviews.

Dr. Amanda Taylor, the director of nursing at the rape crisis center and an expert in sexual assault examination, identified the medical report for the physical examination of twelve-year-old G.B. that was performed on June 13, 2018, by Nurse Margaret McCallum, who had since passed away. She testified that the report reflected that there were no injuries found during the genital examination, but that would not be unusual in a child, such as G.B., who had already started her menstrual cycle and had estrogen in the area that "ma[de] the tissues . . . more stretchy[.]" The report reflected that G.B. was "[c]ontrolled and then cooperative and quiet[,]" providing brief answers to questions.

On cross-examination, Dr. Taylor acknowledged that the checklist on the first page of the report reflected that G.B. was not penetrated vaginally, anally, or orally. She agreed that the report was prepared by someone she trusted to be accurate who had interviewed the child outside the presence of her parents.

Former TBI Special Agent Forensic Scientist Elizabeth Fortin, an expert in forensic science and the TBI forensic scientist who conducted the DNA analysis of swabs collected as part of G.B.'s rape kit, testified that forensic DNA testing first involved serology, or testing for the presence of bodily fluids such as blood, semen, or saliva, and then conducting the four steps of DNA testing: extraction, or breaking open the cells to get to the DNA; quantification, or determining how much DNA was present; amplification of the DNA found by the use of an instrument that "mimics the process that our body goes through to replicate that DNA"; and finally obtaining a DNA profile.

Ms. Fortin testified that "autosomal DNA" testing was DNA testing that showed an individual's DNA inherited from both mother and father, whereas Y-STR testing was male specific, looking only at certain locations on the Y chromosome. She stated that bodily fluids "leave behind a large amount of DNA" but that "touch DNA" typically did not leave as much DNA, which lowered the chances of obtaining a good DNA profile from it.

Ms. Fortin did not find any bodily fluids on any of the swabs from G.B.'s rape kit. DNA testing of the swab from G.B.'s breast showed a mixture profile containing the DNA of at least two individuals, including at least one male. The major profile was consistent with the DNA profile of G.B., but the "interpretation of the minor profile [was] deemed to be inconclusive" due to the limited amount of DNA present. "Quantification results" of the back/upper buttocks and vulvar swabs indicated that those exhibits "may be more suitable for Y-STR testing" so "no autosomal STR testing was performed." The vaginal swab "did not indicate a sufficient amount of male DNA for analysis." Therefore, "[n]o further testing was performed."

Ms. Fortin testified that she obtained a limited Y-STR profile from her Y-STR testing of the breast swab, but "[d]ue to the limited profile obtained, interpretation of this profile [was] deemed to be inconclusive." She attempted to obtain a Y-STR profile from the back and upper buttocks swab, "but no Y-STR profile was obtained." She obtained a limited Y-STR profile from the vulvar swab, but, as with the breast swab, interpretation was deemed to be inconclusive due to the limited profile she obtained.

Ms. Fortin testified that she had reviewed the report created by the Defendant's expert witness, Ms. Samantha Spencer, and disagreed with her conclusion that the Defendant could be excluded as the contributor of the male DNA, testifying that the path Ms. Spencer took to reach that conclusion was contrary to the policies of the TBI.

Letitia Cole, a forensic interviewer with the Memphis Child Advocacy Center, testified that on July 5, 2018, she conducted a forensic interview of fifteen-year-old F.S., whom she noted on her report was "developmentally delayed." The CD of that interview, previously admitted as an exhibit, was then published to the jury. Ms. Cole identified the anatomical drawing that she used during her interview in which F.S. identified the body parts where she had been touched. The drawing showed that the pubic area, marked as "P," buttocks, and breasts were marked. Ms. Cole said she wrote "inside" next to the "P" because F.S. said that she was touched inside that area.

Patricia Lewis, a supervisor and forensic interviewer at the Memphis Child Advocacy Center, testified that she conducted a forensic interview of six-year-old B.B. on July 5, 2018. According to the checklist on the first page of her report, B.B. identified where the offenses occurred, identified grooming behavior, described the presence of

others, provided specifics about her clothing and the perpetrator's clothing, and appeared developmentally delayed. The CD of her interview with B.B., previously admitted as an exhibit, was published to the jury. Ms. Lewis identified the anatomical drawings of a male and a female that she had used in the interview to mark the areas that B.B. reported she had touched the Defendant, and that the Defendant had touched her.

Teresa Onry, a forensic interviewer with the Memphis Child Advocacy Center, testified that on July 5, 2018, she conducted a forensic interview of seven-year-old M.B. That same day, she also conducted a forensic interview of twelve-year-old G.B. On the "disclosure information guide" on the first sheet of her report of G.B.'s interview, she checked that G.B. clearly identified the alleged offender; identified oral penetration, digital penetration, fondling, and bodily fluids; identified where the offense took place; described props; described specifics of her clothing and of the offender's clothing; and excluded the possibility of a different offender. The CDs of those two interviews, previously admitted as exhibits, were published to the jury.

On cross-examination, she stated that she did not know if the victims had talked amongst themselves. She agreed that M.B. told her that the day that the incident happened to her was a one-time event, that it was the same day that G.B. made her disclosure about what happened to G.B., and that G.B. told everyone that day about what had happened to her. She further agreed that M.B. first told her that she saw what had happened to G.B. by peeking through a door but then changed her account, saying that she did not see what happened to G.B.

She acknowledged that G.B. was very talkative in her interview and volunteered a lot of information, including that she had seen pornography on the Defendant's cell phone. On further cross and re-cross examination, she acknowledged that G.B. also said during the interview that she had told family members, including her father, mother, grandmother, Aunt Loretta, Uncle Anthony, and her cousin Mario about what was happening prior to the time she told her father on June 12. She testified that G.B. told her that she texted her Aunt Loretta on June 12 to tell her what had happened, and that it was her Aunt Loretta who encouraged her to tell her father.

**Defendant's Proof**

Samantha Spencer, an expert in forensic biology, former special agent forensic scientist with the TBI, and current owner of "SEP Forensic Consultants LLC[,]" testified that she had reviewed the entirety of Ms. Fortin's file, "along with the manuals and standard operating procedures associated with the time frame in which th[e] case was worked" and prepared her own official amended forensic biology report. She agreed with Ms. Fortin that the minor profile obtained from the autosomal DNA "was inconclusive to say whether

or not [the Defendant] is present." However, she disagreed that the Y-STR profiles obtained from the breast and vulvar swabs were inconclusive. Her opinion was that "[the Defendant] c[ould] be excluded from both of th[ose] Y-STR profiles."

When asked on cross-examination to reconcile the sentence of her report in which she stated that the autosomal DNA profile generated from the breast swab excluded the Defendant as a contributor with her testimony that the autosomal DNA was inconclusive, she replied that the Defendant could be excluded as a contributor to the male DNA from the breast swab based on the results of the autosomal testing combined with the Y-STR testing from the same swab.

On redirect examination, she testified that there were potential clues as to the identity in the autosomal DNA because there was "a lot of sharing of alleles[,]" which "sometimes can indicate that the DNA is consistent with somebody within that person's family."

The Defendant elected not to testify and rested his case without presenting any further proof.

### State's Rebuttal Proof

TBI Agent Lawrence James, supervisor of the TBI Laboratory in Jackson and an expert in DNA forensic analysis and biology, testified that he had reviewed Ms. Fortin's work and agreed with her conclusions. He had also reviewed Ms. Spencer's report and disagreed with her conclusions. He said that the only way that Ms. Spencer was able to exclude the Defendant as a contributor to the male DNA from the breast swab was by assuming that the DNA mixture profile from that swab contained the DNA of only one male, which TBI policies and procedures did not permit because the number of alleles present was "below a certain threshold . . . to make any definitive determination on the number of contributors." He stated that he could "speculate all day" on the source of the male DNA, testifying that it could be from a perpetrator or could be from a "community washcloth" in the home that was being used by numerous people.

After deliberations, the jury convicted the Defendant of the offenses as charged, and the trial court subsequently sentenced him to an effective term of fifty-one years at 100% in the Tennessee Department of Correction. Following the denial of his motion for new trial, the Defendant filed a timely notice of appeal to this court.

## I. Alleged *Brady* Violation

As his first issue, the Defendant contends that he is entitled to a new trial due to the State's commission of a *Brady* violation by "failing to disclose and knowingly withholding" "potentially exculpatory" evidence "relating to a criminal investigation into a third-party alternate perpetrator sexually abusing one or more of the same victims[.]" The Defendant argues that "information that a male family member was being investigated for similar crimes against the same victim group" was extremely favorable to his alternate perpetrator defense, asserting that the DNA evidence from G.B.'s breast and vulvar swabs excluded him as a contributor and "point[ed] to the probability of a perpetrator from within the family group." The State argues that the trial court properly determined that the Defendant failed to prove that the State violated its duty under *Brady*. We agree with the State.

The record reflects that the State objected when defense counsel attempted to question Mr. B. about why his children and his brother's children no longer visited each other's homes. In the jury-out conference that followed, defense counsel stated that Mr. B.'s brother, Carl, was currently under investigation for sexual assault against another one of Mr. B.'s daughters and other family members. Defense counsel argued that the information constituted *Brady* material, and that it was relevant and admissible to show the possibility of an alternate perpetrator. The trial court sustained the State's objection but later allowed the defense to make an offer of proof about the matter.

In the offer of proof, Mr. B. testified that he no longer allowed his children to visit at his brother's home because of a 2021 incident in which his brother sexually assaulted Mr. B.'s daughter, S.B. He said that S.B. was the only one of his children involved. He agreed that he no longer allowed any of his children to visit his brother's home because he viewed his brother as a potential threat to all his children. On cross-examination, he testified that he did not witness the alleged sexual assault, and that, to his knowledge, the matter was still under investigation.

Under *Brady*, the State has a constitutional duty to furnish an accused with exculpatory evidence pertaining to the accused's guilt or innocence or to the potential punishment faced by the accused. 373 U.S. at 87. To that end, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* This duty extends to evidence that may be used by the accused for impeachment purposes. *Giglio v. United States*, 405 U.S. 150, 154-55 (1972).

To establish a *Brady* violation, a defendant must show that: (1) he or she requested the information (unless the evidence is obviously exculpatory, in which case the State is

obligated to release such evidence regardless of whether or not it was requested); (2) the State suppressed the information; (3) the information was favorable to the defendant; and (4) the information was material. *State v. Edgin*, 902 S.W.2d 387, 390 (Tenn. 1995). Evidence is favorable if it "'provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensable, element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness.'" *Johnson v. State*, 38 S.W.3d 52, 56-57 (Tenn. 2001) (quoting *Commonwealth v. Ellison*, 379 N.E.2d 560, 571 (Mass. 1978)). Generally, "[e]vidence is deemed to be material when 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Id.* at 58 (quoting *Edgin*, 902 S.W.2d at 390).

Whether a defendant is entitled to a new trial based upon a *Brady* violation "presents a mixed question of law and fact." *Cauthern v. State*, 145 S.W.3d 571, 599 (Tenn. Crim. App. 2004). The trial court's findings of fact, such as whether the defendant requested the information or whether the state withheld the information, are reviewed on appeal de novo with a presumption that the findings are correct unless the evidence preponderates otherwise. The trial court's conclusions of law, such as whether the information was favorable or material, are reviewed under a purely de novo standard with no presumption of correctness. *Id.*

The trial court addressed the alleged *Brady* violation issue in its very thorough order denying the Defendant's motion for new trial. The trial court first noted that defense counsel acknowledged at the September 6, 2023 first setting for the hearing on the motion that the defense had become

> aware of the "Carl [B.] investigation" prior to trial through its own investigation but did not specifically ask the State to provide information concerning the investigation, did not ask the Court to order the State to provide information pertaining to the same, and did not seek a continuance of the case to conduct further investigation on the matter.

The trial court then noted that on the second, January 26, 2024 setting, defense counsel again acknowledged that the defense was aware of the Carl B. investigation and had made the tactical decisions not to ask for discovery or a continuance to investigate the matter.

The trial court observed that when it asked what specific information had been suppressed by the State, the defense responded that it "could not provide such a list" because it had never been given any discovery on the matter. The trial court then ordered the State "to provide such discovery and continued the hearing to allow the Defense an

- 12 -

opportunity to review the materials and conduct whatever investigation it so desired." Thereafter, the defense filed a "Memorandum in Support of Motion for New Trial" to which it attached a "probable cause" document stating that on August 27, 2021, fourteen-year-old S.B. "blurted out" in class that Carl B. had been kissing her. S.B.'s teacher, who overheard the remark, contacted a Department of Children's Services worker, who conducted a field interview of S.B. During that interview, S.B. disclosed that her Uncle Carl had been touching her breast and her vagina. In a subsequent forensic interview, S.B. stated that, while at her Uncle's Carl's residence, Carl B. had kissed her mouth, kissed her breasts and touched them with his hands, and touched her vagina inside her pants.

After reviewing the dissimilarities between the offenses at trial and the allegations contained in the probable cause document, the trial court concluded that the Defendant could not establish any of the four elements of a *Brady* violation. Specifically, it found that the Defendant had neither requested the information nor was it obviously exculpatory, that the State had not suppressed the information, that the information was not favorable to the defense, and that the information was not material. With respect to the materiality element, the trial court stated in pertinent part:

> Assuming for the sake of argument and legal analysis that the information about the details of the ongoing investigation met all three requirements (obviously exculpatory, suppressed and favorable) it is this "materiality" prong that this court finds clearly not satisfied. The present case involved four child victims who all were familiar with the Defendant, and all identified the Defendant, both contemporaneously to the event and years later at trial, as the perpetrator. This was not the typical child sexual assault in which the jury has to decide whether to believe a single victim. The four children essentially corroborated each other's testimony. Furthermore, this was not a case in which there was any danger of mistaken identification of a stranger. This case hinged solely on credibility of the four victims. Defense counsel cross-examined the children and brought out any inconsistencies in their testimony, but the jury who saw that testimony, as well as the recorded forensic videos, chose to believe the children. In addition, despite the defense attempts to characterize the touch DNA evidence as supporting a third-party defense, a close examination of that evidence does not show it to be the "smoking gun." In fact, it did little to assist the jury. Any proof that another child had been sexually assaulted three years later by a family member would have done nothing to impeach or contradict the testimony of the four children in this case. Furthermore, despite the [d]efense characterization of the details as being "identical[,]" as this court has already pointed out, the similarities are not unique and, in fact, there were more dissimilarities than there were similarities. Simply put, there

- 13 -

is no reasonable probability that had the evidence been disclosed, the result of the proceeding would have been different.

We agree with the trial court's analysis of the issue. We first note that the "probable cause" document does not support the Defendant's claim that Carl B. was being investigated for sexual crimes against any of the four victims in the instant trial.[4] Moreover, the Defendant's assertions that he was excluded as a contributor to the male DNA found on swabs from the rape kit, and that the DNA evidence pointed to the likelihood of a family member of the victims as the perpetrator, were based on conclusions of the Defendant's expert witness that the State's experts refuted. Further, Ms. Fortin found no bodily fluids on any of the swabs from the rape kit, meaning that the DNA she tested was touch DNA, which, as TBI Agent James explained, could have been deposited by someone who groped G.B., or by G.B.'s use of a "community washcloth" in the home, or in any number of ways. Thus, as the trial court so aptly noted, the DNA evidence on which the Defendant relies so heavily was no "smoking gun" that pointed to an alternate perpetrator. Finally, and most importantly, as the trial court also noted, the victims in this case, who were all familiar with the Defendant and the alleged alternate perpetrator, each identified the Defendant as the perpetrator. As such, we agree with the trial court that the State's "failure to disclose the details of an entirely separate crime committed three years later . . . was not required by *Brady*." The Defendant has not shown that the State committed a *Brady v*iolation, and, therefore, is not entitled to relief based on this issue.

## II. Sufficiency of the Evidence

The Defendant next contends that the evidence is insufficient to sustain his convictions. In essence, he challenges the credibility of the child victims, citing the various inconsistencies in their testimony and pointing out that the nurse who conducted the physical examination of G.B. marked that there was no vaginal, oral, or anal penetration. He argues that "[t]he youth and immaturity of the four children and their inconsistent and contradictory narrative of the alleged incidents render the evidence insufficient to carry the State's burden of proof." The State points out that credibility determinations are within the province of the jury and argues that the evidence is sufficient to sustain the convictions. We, again, agree with the State.

When the sufficiency of the evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable

---

[4] According to defense counsel's statements at the hearing on the motion for new trial, S.B. was the victim in the seventh count of the indictment, which was nolle prosequied. The seventh count of the indictment is not contained in the record provided to this court.

to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

Therefore, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from it. *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). Our supreme court has stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus, the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citation omitted). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). The standard of review for the sufficiency of the evidence is the same whether the conviction is based on direct or circumstantial evidence or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

As the trial court noted in its order denying the motion for new trial, the jury heard the testimony of the child victims and saw the CDs of their forensic interviews and, thus, was able to compare the accounts the victims provided at trial to the accounts they provided to the forensic interviewers. The jury was able to directly hear the victims' testimony, to see their demeanor, and to judge their credibility. The jury also heard the evidence that the sexual assault checklist prepared by the nurse as part of G.B's rape kit marked that there

had been no vaginal, oral, or anal penetration, and watched the cross-examination of the victims, in which defense counsel attempted to show that G.B. had a motive to fabricate the allegations and to influence her sisters and her cousin into doing the same. By convicting the Defendant of the indicted offenses, the jury obviously chose to resolve any inconsistencies in the evidence and the victims' accounts in the favor of the State. This was its prerogative as the trier of fact. Accordingly, we conclude that the evidence is sufficient to sustain the Defendant's convictions.

## CONCLUSION

Based on our review, we affirm the judgments of the trial court.

s/ John W. Campbell
Judge John W. Campbell, Sr.